**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BELINDA L. TOMPKINS,      )
           )
     Plaintiff,      )
           )
     v.      )   C. A. No. 08-175-SLR-MPT
           )
MICHAEL J. ASTRUE      )
Commissioner      )
Social Security Administration,      )
           )
     Defendant.      )

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff Belinda L. Tompkins ("plaintiff") filed this action under 42 U.S.C.

§ 1383(c)(3) against Michael J. Astrue, Commissioner of Social Security Administration

("SSA") ("defendant"), on March 28, 2008.[1]  Plaintiff seeks judicial review, pursuant to

42 U.S.C. § 405(g), of a decision by defendant denying her claim denying her claim for

supplemental security income ("SSI") under Title XVI of the Social Security Act (the

"Act").[2]  Currently before the court are the parties' cross-motions for summary

judgment.[3]  For the reasons stated below, the court recommends that plaintiff's motion

for summary judgment be granted in part and denied in part, and that defendant's cross-

motion for summary judgment be granted in part and denied in part.

## II.  JURISDICTION

A district court has the jurisdiction to review an administrative law judge's ("ALJ")

decision in an SSI disability benefits case once it becomes the final decision of the

---

[1] D.I. 2.
[2] 42 U.S.C. §§ 1381-1383f.
[3] D.I. 16, 17.

Commissioner.[4]  A decision of the Commissioner becomes final when the Appeals

Council either affirms the ALJ's decision, denies review of an ALJ's decision, or when

claimant fails to appeal the ALJ's decision within 60 days of unfavorable ruling.[5]

Here, ALJ's decision is the final decision of the Commissioner because the

Appeals Counsel denied plaintiff's request for appeal.  Therefore, this court has

jurisdiction to review the ALJ's decision.

## III.    BACKGROUND/FACTS

### A.    Procedural Background

Plaintiff applied for SSI benefits on April 26, 2005, asserting a disability onset

date of March 1, 2005.  Defendant denied plaintiff's application on July 8, 2005.  On July

26, 2005, plaintiff filed for reconsideration, and on October 13, 2005, defendant

rendered a reconsideration declaration affirming his initial determination.

On December 14, 2005, plaintiff requested a hearing before the ALJ.  That

hearing was held on November 9, 2006.  Plaintiff, who was represented by counsel,

testified before the ALJ.  An impartial vocational expert, Tony Melanson, was present

throughout the hearing and also testified, as did plaintiff's daughters Michelle Tompkins

and Marcia Tompkins.[6]

On May 11, 2007, the ALJ determined, based on the hearing testimony and the

record, that plaintiff is not disabled within the meaning of § 1614(a)(3)(A) of the Social

---

[4] 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides.").
[5] *See* 20 C. F. R. § 416.1455; *see also* 20 C.F.R. § 404.905.
[6] D.I. 14 at 320.

Security Act and, therefore, not eligible for SSI.  The ALJ found the following:

1.  The claimant has not engaged in substantial gainful activity since March 1, 2005, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).
2.  The claimant has the following severe impairments:  obesity, chronic obstructive pulmonary disease, and bilateral carpal tunnel release status point surgical releases (20 CFR 416.920(c)).
* * *
3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
* * *
4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a substantial range of sedentary work.  She is only occasionally able to climb stairs, ramps, ladders, ropes or scaffolds and occasionally crawl.  She must avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, poor ventilation, etc.  She is limited to frequent rather than constant handling and fingering.
* * *
5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).
* * *
6.  The claimant was born on June 28, 1964 and was 40 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).
7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).
8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).
* * *
10.  The claimant has not been under a disability, as defined in the Social Security Act, since April 11, 2005, the date the application was filed (20

3

CFR 416.920(g)).[7]

On June 27, 2007, plaintiff requested review of the ALJ's decision and, on February 8, 2008, the ALJ's decision became the final decision of defendant when it was approved by the Appeals Counsel.  Thereafter, plaintiff brought the present action seeking judicial review of the ALJ's final decision.

**B.      Plaintiff's Submissions to SSA**

On April 26, 2005, plaintiff submitted an Application for Supplemental Security Income and an Application for Disability Insurance Benefits in which she indicated that she had been unable to work since March 1, 2005 because of her disabling condition due to chronic obstructive pulmonary disease ("COPD") and bilateral carpal tunnel syndrome.[8]

In her May 20, 2005, Pain Questionnaire, plaintiff described daily, continual, sharp pain in both of her hands, which extended half way up her arms and was exacerbated by movement, lifting, and holding anything in her hands.  The pain was worse in the evenings, especially with sleep, which caused her to awaken at least three times every night.  At that time, she did not report taking any medication for her pain. She noted that on May 5, 2005, she had surgery on her right hand and was scheduled for surgery on her left in the near future.  Because of the hand pain, she was unable to hold a paint brush and stopped working as a painter.[9]

On that same date, plaintiff also completed a Function Report detailing

---

[7] *Id.* at 15-23.
[8] *Id.* at 13, 61-68.
[9] *Id.* at 76-77.

information about her daily activities and abilities in which she represented that she

could no longer work at her job as a painter due to breathing problems and hand pain.[10]

Regarding her daily activities, plaintiff reported that she typically spent her day

cleaning the house, "hanging out" with her children and grandchildren, doing some yard

work, watching television, preparing meals.[11]   Since her granddaughter resides with her

during the week, plaintiff helps the child prepare for school every morning and with

homework.[12]   Plaintiff prepares her own meals daily, which takes from a half-hour to two

hours daily.  Because of the pain, plaintiff denied any heavy lifting and holding a spoon

for too long.[13]

Due to her health conditions, sleep is interrupted by soreness in her hands and

trouble breathing.  She indicated that her conditions did not affect her ability to dress,

bathe, shave, feed herself, or use the toilet, but that hair care was affected by her hand

pain.[14]   Although plaintiff admitted that she could clean, vacuum, dust, sweep and mop

floors, and do laundry, she stated that it takes her longer to perform such chores and

that at times she needs help because of hand pain or shortness of breath.[15]

Plaintiff can drive and is able to go out alone weekly for two hours or longer,

depending on her breathing, to shop for food and household items.[16]   She handles her

personal finances as she did before the onset of her health problems.[17]

_____

[10] *Id.* at 78-85.
[11] *Id.* at 78.
[12] *Id.* at 79.
[13] *Id.* at 80.
[14] *Id.* at 79.
[15] *Id.* at 80.
[16] *Id.* at 81.
[17] *Id.* at 81-82.

Both shortness of breath and hand pain has limited her activities of yard work (planting flowers), painting, needle point, and watching television.[18]  On a daily basis, she talked on the phone, and went to the park with her grandchildren.  She also regularly visited her daughter; however, because of shortness of breath or hand pain, she infrequently engages in such activities.[19]

Plaintiff reported that lifting, walking, talking, stair-climbing, and using her hands had been affected by her conditions.  Hand pain made it difficult to lift things and to use a pencil to write.  Breathing was difficult when climbing stairs, walking, and talking. When she gets out of breath from walking, she has to rest for 10 to 20 minutes after using an inhaler.[20]

Plaintiff indicated no problems with concentration, can follow written and verbal instructions well, and no difficulty with authority figures or co-workers.  She stated she handles stress and changes in routine "pretty good."[21]

Finally, she reported daily use of hand braces, prescribed in April 2005, which are somewhat helpful with her hand pain.[22]

### C.    Medical Evidence[23]

Dr. Schwartz and Referrals by Dr. Schwartz

On March 31, 2005, Eric T. Schwartz, M.D. of the Delaware Orthopaedics & Sports Medicine, PA, examined plaintiff and noted her complaints of bilateral hand pain

---

[18] *Id.* at 82.
[19] *Id.* at 82-83.
[20] *Id.* at 83.
[21] *Id.* at 83-84.
[22] *Id.* at 84.
[23] All facts and medical information referenced herein are found in D.I. 14, 16, 18, and 20.

and numbness for the prior six months or so and diagnosed her as having clinical carpal tunnel syndrom and provided her with a prescription for bilateral wrist braces to be worn at night.  Dr. Schwartz referred the plaintiff to Asit P. Upadhyay, D.O., of the Delaware Back Pain & Sports Rehabilitation Centers, for an EMG of the bilateral upper extremities.[24]

On April 12, 2005, Dr. Upadhyay reported that plaintiff complained of pain in her arms for six to seven months.  She used braces at night without significant beneficial effect.  She did not have neck pain or cervical radicular symptoms.  She had a history of thyroid disease, but otherwise her past medical history was negative.  Physical examination showed no atrophy of the hand intrinsics and no dysvascular changes.  Deep tendon reflexes were symmetric and strength for the upper extremities was 5/5 and symmetric.  A needle EMG/nerve conduction study revealed moderately severe bilateral carpal tunnel syndrome.  There was also marked axonal loss bilaterally.[25]

As a result of the EMG/nerve conduction study findings, Dr. Schwartz performed right carpal tunnel release surgery on plaintiff on May 9, 2005.[26]  Thereafter, plaintiff returned to Dr. Schwartz on July 7, 2005 complaining of numbness in her right hand fingers and severe pain in that hand.  Dr. Schwartz referred plaintiff to a physical therapist for evaluation and management.[27]

On July 18, 2005, plaintiff was evaluated at Physical Therapy Services, Inc. ("PTS"), presenting with decreased range of motion and increased pain after carpal

---

[24] D.I. 14 at 91.
[25] *Id.* at 86-88.
[26] *Id.* at 90.
[27] *Id.* at 155-56.

tunnel release.  She was treated and instructed on a home exercise program and continued physical therapy was planned.  Plaintiff's evaluation report listed rehabilitation potential as "Good."[28]  A subsequent physical therapy progress report from PTS to Dr. Schwartz, dated August 10, 2005, indicated that plaintiff had undergone physical therapy a total of nine times since her initial evaluation and that her range of motion was grossly within normal limits in all planes.  Plaintiff continued to have some soreness with resisted pronation in the thenar eminence.  The report also noted that wrist flexion and extension strength remained somewhat reduced at 4/5, but at that time plaintiff was making good progress.[29]

On August 22, 2005, plaintiff returned to Dr. Schwartz for reevaluation of her right hand.  She reported that she had been attending physical therapy but that she still had a lot of scar tissue tenderness.  Dr. Schwartz noted that despite physical therapy, plaintiff could not make a full fist.  His diagnosis was status post right carpal tunnel release and he recommended continued physical therapy and to return to his office for a reevaluation in two months.[30]

Plaintiff was again reevaluated by Dr. Schwartz on November 28, 2005, during which she reported continued nighttime numbness and tingling in her right hand, but significant improvement from her surgery.  She complained that symptoms in her left hand were becoming worse.  On examination, Dr. Schwartz noted good range of motion and no numbness or tingling in her right hand, and the tips of all five fingers on her left

[28] *Id.* at 106-07.
[29] *Id.* at 110.
[30] *Id.* at 154.

8

hand as numb.  He diagnosed left carpal tunnel syndrome and advised that if her left hand symptoms continued to worsen, surgery may be considered.  He warned, however, that due to the severity of the impingement, return to 100% normal might not occur.  After Dr. Schwartz explained and discussed the surgery in detail with her, plaintiff opted to proceed with the surgery.[31]  On December 12, 2005, Dr. Schwartz performed left carpal tunnel release surgery.[32]

Nearly a year later, on November 15, 2006, plaintiff returned to Dr. Schwartz complaining of pain bilaterally in her hands and tenderness at her carpal tunnel surgical sites.  On examination Dr. Schwartz noted bilateral hand pain from the metacarpophalangeal joints to the proximal interphalangeal joints; no evidence of swelling; pain with full flexion of her fingers; hypersensitivity at the scar site; and good range of motion of the wrists.  Dr. Schwartz diagnoses was bilateral hand scar sensitivity status post carpal tunnel release and bilateral hand pain.  Dr. Schwartz prescribed Tylenol No. 3 and instructed plaintiff to modify painful activities and rub the scar sites to help desensitize the area.  She was referred to Eric R. Tamesis, M.D. for a rheumatologic evaluation.[33]  A June 13, 2007 record from Dr. Tamesis indicates a hepatic function panel was run, and a chest x-ray taken.  The diagnosis was "chest pains/ Dy[s]pnea."[34]  Plaintiff was prescribed Methotrexate 2.5 mg and instructed to take four tablets orally once per week.[35]

---

[31] *Id.* at 153.
[32] *Id.* at 152.
[33] *Id.* at 150.
[34] *Id.* at 314-15.
[35] *Id.* at 316.

9

Dr. Lifrak

On June 29, 2005, Dr. Irwin Lifrak, a state agency consultative examiner with the Delaware Disability Determination Service, examined plaintiff.  At that time, her chief complaints were episodes of shortness of breath and pain in both wrists and hands. She related having episodes of shortness of breath since early childhood, but denied any recent hospitalization for that complaint.  Plaintiff noted first experiencing wrist and hand pain approximately nine months earlier.  She advised of her May 9, 2005 right carpal tunnel release surgery, but stated that the intensity of the pain in both hands remained severe.  Plaintiff estimated that within an eight hour day while taking usual and customary breaks that she was able to:  walk indoors and outdoors without assistive device; climb stairs; sit for a total period of 3-4 hours and stand for a total period of 3-4 hours; and, able to lift up to 10 pounds with both hands.[36]

Upon examination, Dr. Lifrak noted that range of motion was reduced in the area of the lumbar spine and at both hips, with no evidence of muscle spasm.  He reported that plaintiff ambulated without the aid of any assistive device, and her gait caused a mild degree of rhonchi scattered over both lower lungs, with no rales or wheezes present.  He noted a well-healed surgical scar at the area of the right palm, no evidence of cyanosis or clubbing of the digits, and no muscle atrophy or wasting.  He found that plaintiff had 5/5 grip strength at 35 pounds with the right hand and 40 pounds with the left hand.  She exhibited slightly reduced sensation to light touch of the index finger of both hands, but sensation was intact for the remainder of the extremities.  She had

---

[36] *Id.* at 93-94.

10

normal muscle tone in the lower extremities with no evidence of deep venous thrombosis, stasis ulceration, or edema formation of the extremities. Dr. Lifrak diagnosed obstructive pulmonary disease, degenerative joint disease, and carpal tunnel syndrome.[37] Based on his examination and the historical information, Dr. Lifrak concluded that within an eight hour day, while taking usual and customary breaks, and without the aid of any assistive device, plaintiff was able: to perform activities which may require her to walk indoors or outdoors, climb stairs, sit for a total period of 5-6 hours and stand for a total period of 5 hours. Additionally, plaintiff was able to lift weights of 10 pounds with either hand on a regular basis.[38]

Dr. Puri

On July 14, 2005, Vineet Puri, M.D. examined plaintiff who complained of shortness of breath and wheezing, as well as pain and numbness in her hands at night. Examination of plaintiff's chest revealed normal breathing movements, normal air entry, and no rales or rhonchi. She had a normal gait, power in all extremities was 5/5, with normal tone, and sensory system intact. Dr. Puri's diagnoses included COPD/bronchial asthma/emphysema, carpal tunnel syndrome that was worse than before, hypothyroidism, history of Grave's disease, obesity, cigarette smoker, and hyperlipidemia. Medications prescribed included: Combivent two inhalations four times daily as needed; Zyrtec 10mg daily; Zantac 150 mg twice daily; benadryl 25 mg three times daily; and continued use of Advair 250/50 one inhalation twice daily. He also

---

[37] *Id.* at 94-95.
[38] *Id.* at 96.

counseled plaintiff to quit smoking.[39]  Dr. Puri examined plaintiff on October 26, 2005

and November 8, 2005 and made similar objective findings and recommendations as

during the July 15, 2005 examination.[40]

On April 18, 2006, Dr. Puri admitted plaintiff to Kent General Hospital after she

experienced breathing problems following a gynecological procedure.  Her history was

recent treatment for an upper respiratory tract infection and exacerbation of chronic

obstructive pulmonary disease.  Upon examination of the lungs, Dr. Puri noted

extensive rhonchi heard bilaterally, without rales.[41]  Plaintiff's April 20, 2006 discharge

diagnoses included:  respiratory failure, resolved; pneumonia, left lower lung; and

chronic obstructive pulmonary disease exacerbation, status post hysteroscopy and

endometrial ablation for metromenorrhagia, and gastroesophageal reflux disease

("GERD").  Discharge medications included various inhalers and respiratory drugs,

Zyrtec, Flonase, Levaquin, and Prednisone.  She was again urged to quit smoking.[42]

On November 7, 2006, Dr. Puri noted that plaintiff was applying for disability.

The record shows that she had had a cardiac catheterization approximately three weeks

earlier which revealed normal coronaries.  At that office visit, she voiced the following

complaints: hand pain, stating the carpal tunnel release surgeries had not helped (with

the record noting she had permanent damage to her median nerve); could not lift even

10 lbs.; and, could not open anything with her hands.  Plaintiff also complained of head

---

[39] *Id.* at 111-12.
[40] *Id.* at 116-21.
[41] *Id.* at 175-76.
[42] *Id.* at 168-69.  A March 15, 2006 record also indicates that plaintiff was taken by ambulance to the emergency room of Kent General Hospital complaining of a productive cough and includes a triage note of abdominal pain/distention and wheezing.  *Id.* at 161-65.

congestion with cough and thick postnasal drip.  Her chest examination, however, was

normal with no wheezing.  Dr. Puri also found normal appearance of her joints, normal

muscle mass, and normal range of motion.  Evidence of varicose veins was noted on

her lower left leg, with no pedal edema, normal gait, and power was 5/5 in all

extremities.  Her medications were listed as Nasonex 50mcg/inh; Clarinex 5mg;

Singular 10 mg; Synthroid 0.2 mg; Advair 500/50; and Entex PSE 600 mg-120 mg.[43]

During that office visit, Dr. Puri completed and executed a physician's statement

in which he reported:   that as plaintiff's family physician, he had been treating her for

approximately 2 ½ years; that in March 2004, he advised plaintiff to stop working as a

painter because the fumes were exacerbating her chronic COPD and asthma; that she

had had carpal tunnel surgery due to chronic pain in her wrists and that, even after the

surgeries, she complained of wrist pain; that he advised her to not lift over 10 pounds;

that despite treatment for allergies, asthma, and COPD by Dr. Lakhani, her condition

had been getting worse; that she had chest complaints for which she was scheduled to

have a heart catheterization with Dr. Grewal; and, that she was being treated for

blockages in her legs.  He recited that plaintiff's problems with her legs, breathing, and

hands would interfere with her ability to maintain regular work.  Since plaintiff reported

shortness of breath with little exertion, Dr. Puri opined that any job which required her to

exert herself on an 8-hour a day basis would be prohibited.  Dr. Puri further stated that

because of her leg problems, she should not have a job which required regular

standing.[44]  He opined that carpal tunnel pain would prevent her from having a job that

[43] *Id.* at 138-39.
[44] *Id.* at 136.

13

required regular repetitive use of her hands.  Dr. Puri noted plaintiff's chronic fatigue
and that, considering her other diagnoses, that complaint was consistent with overall
her condition.  He also concluded that her fatigue would substantially interfere with her
ability to work competitively at any job.  In his opinion, because of the combination of
her problems, plaintiff could not work a regular 40-hour a week basis or consistently
since March 2004.  He further noted that while doing babysitting work during the
summer of 2005, plaintiff frequently experienced shortness of breath.  Despite that
work, Dr. Puri felt that she could not performed any job which failed to provide the
breaks available to her as caring for a single child.[45]

Dr. Barnett

Plaintiff was examined by Thomas Barnett, M.D. on March 3, 2006.  That record
notes pain in both legs, more significant on the left, and swollen ankles.  Her pain
ranged from aching to heaviness with fatigue to throbbing.  These symptoms had
gradually worsened over time, such that she was taking Aleve several times daily for
discomfort.  She reported elevating her legs for discomfort.  She also reported wearing
support hose in the past for varicose veins, but discontinued doing so as they provided
no significant improvement.  She experienced cramps when she did a great deal of
walking.  On examination, Dr. Barnett observed corded varicosities in both legs,
somewhat worse on the left.  Ultrasound testing revealed numerous, very large
incompetent tributaries emerging from the saphenous sheath and leading to the corded
varicosities visible on plaintiff's legs.  Dr. Barnett recommended noninvasive

---

[45] *Id.* at 137.

radiofrequency ablation of the saphenous vein ("VNUS procedure"), which was performed on August 3, 2006.[46]

On August 15, 2006, plaintiff returned with complaints of pain at the procedure site, with some swelling evident in the left upper inner calf area, and evidence of superficial phlebitis in the lower left calf area.  Plaintiff was prescribed Cipro 500 mg twice daily and advised to apply warm compresses to the left calf area and to stay off the leg as much as possible.[47]

On August 24, 2006, plaintiff was reevaluated.  She reported that the left calf area was less swollen with mild decrease in tenderness, and complained of severe swelling in her foot by the end of the day which subsided by the next morning.  On examination, Dr. Barnett noted the area of the superficial phlebitis was much softer and more mobile than before.  Plaintiff was directed to continue with warm compresses, rest, elevate the leg, and wrap it with an Ace bandage to decrease the swelling.  She was also instructed to take aspirin to help reabsorb the phlebitis.[48]

During an office visit on September 5, 2006, plaintiff complained of some swelling in her left leg.  An ultrasound following her VNUS procedure showed no evidence of deep venous thrombosis ("DVT"), but because of the persistent pain and edema, another ultrasound was recommended to rule out DVT.  She was prescribed Keflex 500 mg three times daily and instructed to take one aspirin daily.  She was also given a prescription for Darvocet N100 and was to return for a follow up examination in two

---

[46] *Id.* at 145-46.
[47] *Id.* at 146.
[48] *Id.*

days.[49]

During an office visit on September 7, 2007, slight swelling in her left leg remained, the redness was reduced, and there was no evidence of DVT.  She was instructed to finish her previously prescribed antibiotics and to use an Ace bandage daily and at night when sleeping.  By September 19, plaintiff felt much better, the leg edema was significantly less, and the discoloration had diminished.[50]

On October 5, 2006, plaintiff reported that standing in excess of 15 minutes causes swelling in her left lower leg, despite wearing the support stocking.  The stocking had been helping but she was concerned because she continued to have swelling overall.[51]

Dr. Lakhani

On October 2, 2006, Shankar Lakhani, M.D., an allergy and asthma specialist with Peninsula Allergy and Asthma Associates, performed pulmonary function and allergy tests on plaintiff.[52]  In a letter to Dr. Puri dated October 24, 2006, Dr. Lakhani advised that plaintiff was seen for an initial evaluation of uncontrolled asthma, suspected allergic rhinitis, history of acute urticaria, possible food allergies, and a chronic smoker.  She reported a diagnosis of asthma 2-3 years prior.  Her then-current medications included:  various inhalers and respiratory drugs; over-the-counter Claritin (which was on hold for one week); benadryl as needed; Synthroid; 81 mg aspirin daily and an EpiPen.  Despite those medications, she reported using a rescue inhaler 4-6

---

[49] *Id.* at 147.
[50] *Id.*
[51] *Id.* at 148.
[52] *Id.* at 125-26.

times daily, and sometimes up to 8-10 times daily for her cough and chest tightness. She reported nightly interrupted sleep due to coughing, wheezing and shortness of breath.  She also required prednisone 3-4 time a year.  She complained of significant allergy symptoms, for which she took over-the-counter medications for relief. She was a chronic smoker, recently cutting down to ½ pack daily, and had hypothyroidism.  She reported her COPD diagnosis and that she had had multiple episodes of pneumonia and multiple admissions for that.[53]

On examination, Dr. Lakhani found that plaintiff weighed 251 pounds, height of 68 inches, and vital signs within normal limits.  Chest examination revealed bilateral equal breath sounds with prolonged expiration, mild scattered end-expiratory wheezing, and no rales.  A spirometry study revealed forced vital capacity (FVC) of 61 percent and a one-second forced expiratory volume ($FEV_1$) of 55 percent, ratio 89 percent and $FEF_{25\%-75\%}$ was 45 percent of her predicted values.  Those results indicated significant impairment in the upper and lower airways, and the combination of obstructive and restrictive lung disease.[54]  Additionally, allergy tests were positive for several common environmental allergens and some selected foods.[55]  Dr. Lakhani's assessment was that the plaintiff had moderate, persistent asthma complicated by COPD, currently not controlled; stable symptomatic perennial allergic rhinitis; a history of acute urticaria most probably due to food allergies, currently stable; chronic smoker; hypothyroidism; and, comorbid obesity.  Dr. Lakhani increased the strength and dosage of her Advair dosage,

---

[53] *Id.* at 141-42.
[54] *Id.* at 142.
[55] *Id.* at 142-43.

prescribed Singulair 10 mg q.h.s., discontinued Claritin, prescribed Clarinex 5 mg q.a.m. and Nasonex 2 sprays in each nostril once daily, instructed her to take Albuterol and/or Combivent on an as needed basis for cough, wheezing, and difficulty breathing; and prescribed prednisone 60 mg once a day for 5 days.  He also advised plaintiff to control her exposure to allergens and to stop smoking.[56]

Dr. Grewal

On October 3, 2006, plaintiff was examined by Harjinder Grewal, M.D. of Cardiology Consultants P.A., for a cardiac evaluation.  Plaintiff complained of episodes of tightness in her chest that had worsened over the prior four to six weeks.  Those episodes usually happened while doing household chores, but also occurred at rest. She reported that when prone her heart tended to beat rapidly.  She had chronic shortness of breath related to COPD and reactive airway disease.[57]  She reported a history of smoking 1 ½ packs of cigarettes a day for thirty years but had recently reduced to ½ pack per day.  Dr. Grewal's examination revealed that plaintiff was moderately obese at 257 pounds and in no acute physical distress and that she had prominent eyes consistent with Graves disease.  Her heart examination revealed normal S1 and S2 sounds, no murmur, gallop or rub was heard, and her lungs were clear.[58]  An EKG revealed normal sinus rhythm, and poor R wave progression in leads. Her legs showed trace edema, left more than right.  Dr. Grewal diagnosed coronary artery disease with exertional angina, systemic hypertension, COPD, history of shellfish

---

[56] *Id.* at 143.
[57] *Id.* at 128.
[58] *Id.* at 129-30.

allergies, Grave's disease, and tobacco abuse.  He suggested a cardiac catheterization and an echocardiogram, and strongly advised for her to quit smoking altogether.[59]

<u>Dr. Salomon</u>

On March 18, 2007,[60] Neal W. Salomon, M.D. reviewed the evidence of record and concluded that plaintiff's impairments did not meet or equal any listed impairment. Dr. Salomon noted plaintiff's obesity, moderate obstructive pulmonary disease (manifested as asthma), modest to moderate restrictive pulmonary disease, frequent use of inhalers, with "rescue" use, as indicative of increasing symptoms.  He concluded that, even though "she has definite limitations, [plaintiff] doesn't meet/equal any listing, even considering her obesity/smoking."[61]  Dr. Salomon found that plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand and/or walk (with normal breaks) for at least 2 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday, was not limited in her ability to push and/or pull (other than as shown for lift and/or carry).[62]  Dr. Salomon further determined that she could occasionally climb, balance, stoop, kneel, crouch, and crawl, but noted that these activities might be limited by obesity and moderate COPD.[63]  He also concluded that she should avoid extreme environmental disturbances primarily due to pulmonary limitations, but noted she "had [an] essentially unremarkable cardiac evaluation."[64]  Dr. Salomon found that the "attending physician statement is well done & quite complete,

---

[59] *Id.* at 130.
[60] Dr. Salomon's Medical Opinion is dated "3/18/07."  *Id.* at 301.  His Physical Residual Functional Capacity Assessment is dated 3/17/07, incorrectly written as "03-17-06."  *Id.* at 309.
[61] *Id.* at 300.
[62] *Id.* at 303.
[63] *Id.* at 304.
[64] *Id.* at 306.

the medical records seem to support her ability to perform routine office work."[65]

State Agency Physicians

On July 8, 2005, a state agency physician reviewed the evidence of record and completed a physical residual functional capacity assessment.  That assessment concluded that plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday, was not limited in pushing and/or pulling (other than as shown for lift and/or carry).[66]  The assessment concluded that plaintiff could occasionally climb and crawl and frequently balance, stoop, kneel, and crouch.[67]  The assessment also noted that plaintiff should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, and the like, but she need not avoid wetness, humidity, noise, or vibration.[68]  Regarding plaintiff's credibility, the assessment found that plaintiff's conditions could reasonably be expected to produce the symptoms she complained of, but her activities of daily living were not significantly limited, indicating that she cooks daily, cleans, vacuums, mops floors, does laundry, cares for a grandchild, does yard work, and enjoys painting and needlework.  Consequently, the assessment determined that overall, plaintiff appeared to be only partially credible.[69]  Another state agency physician affirmed the assessment on October 11, 2005.[70]

---

[65] *Id.* at 309.
[66] *Id.* at 91.
[67] *Id.* at 100.
[68] *Id.* at 102.
[69] *Id.* at 99.
[70] *Id.* at 105.

### D.      Facts Evinced at the Administrative Law Hearing

Plaintiff is a 42 year old female who is 5' 8" and weighs 252 pounds; her weight
fluctuates due to thyroid disease.[71]  According to her testimony, her formal education
ended after the ninth grade.[72]  From 1994 to 2005, she was employed as an interior and
exterior painter of buildings for a private enterprise, working 30 to 40 hours per week
and earning $11 per hour before the onset of her alleged disability.[73]  Her job required
standing and walking most of the day and carrying paint and materials which weighed
approximately 15 to 20 pounds.  She did not work on ladders and scaffolds due to her
fear of heights.  At some point prior to leaving her job, plaintiff supervised painting
crews, with hiring and firing authority.[74]  After quitting work as a painter, she worked as
a babysitter for an infant for approximately six months in 2005.[75]

Plaintiff testified that on March 1, 2005 she became unable to work.  She
explained that on that date, she was examined by Dr. Puri for breathing problems, and
sent for a breathing test which she failed.  Thereafter, Dr. Puri advised that she "was no
longer eligible to work."[76]  Plaintiff claimed that all of her health problems prevented her
from working, but her COPD and asthma, diagnosed in 2005, caused the most
significant limitations.  Both Drs. Puri and Lakhani treated her for those health
problems.[77]  Plaintiff advised that in 2006, while at Kent General Hospital for breathing

---

[71] *Id.* at 324.
[72] *Id.* at 324-25.
[73] *Id.* at 326-27, 330.
[74] *Id.* at 327-28.
[75] *Id.* at 329-30.
[76] *Id.* at 326.
[77] *Id.* at 332.

difficulties, she underwent breathing treatments.[78]  For her COPD and asthma, plaintiff

has been prescribed several medications (including Advair, Albuterol, Combivent, and

Singular) and she uses inhalers 6 to 10 times a day.  Both conditions cause constant

coughing, wheezing, and shortness of breath.[79]  According to plaintiff, shortness of

breath may occur at rest when she talks.[80]  She often experiences chest pain, and the

weather, particularly humidity, wind and cold, affect her symptoms.  No medication is

prescribed for the chest pain.[81]  Recent cessation of smoking has not improved her

breathing symptoms, which had worsened over the past year requiring increased

dosage of her medications.[82]

Another serious health concern is significant left leg swelling, which required

surgery in 2006 performed by Dr. Barnett.[83]  The leg continues to swell and hurt after

limited standing (about 15 minutes) and besides prescribing a support stocking and

propping the affected leg, the doctors have advised that there is no additional treatment.

The swelling resolves over night, but returns upon dependency.[84]  She experiences

daily leg pain, but has not been prescribed nor requested any pain medications for that

condition.  She takes over-the-counter medications (Motrin or Advil) if the pain gets "too

bad."[85]

Plaintiff also confirmed undergoing bilateral carpal tunnel surgery.  Despite that

---

[78] *Id.* at 333.
[79] *Id.* at 334.
[80] *id.* at 334-35.
[81] *Id.* at 335-36.
[82] *Id.*
[83] *Id.* at 336-37.
[84] *Id.* at 336-38.
[85] *Id.* at 338-39.

surgery, the pre-surgical symptoms of cramping and numbness at night, difficulty

grasping, and problems with buttoning continue.  Although she is able to feed herself,

she must hold utensils loosely.  She must rest her hand while brushing her hair or using

a pen to fill out a job application; however, plaintiff acknowledged that she could brush

her teeth and hold a cup.[86]  She experiences constant numbness at the surgical scar

sites for the carpal tunnel surgeries.  She admitted being able to negotiate car door

handles which lift up and door knobs that are "easy . . . to open."  Plaintiff has not driven

for over a year because she does not have a vehicle, and could not state whether she is

able to drive.[87]

Plaintiff recently underwent a heart catheterization, which was negative.

Although she is prescribed medication for hypertension, no further treatment presently

is recommended for her heart.[88]  She is prescribed thyroid medication which the doctor

informs her generally controls her thyroid condition.  She is also prescribed Nasonex

and, more recently, Clarinex which are somewhat helpful for her allergies.  She reported

no negative side affects from her medications.[89]

Regarding her physical capabilities, plaintiff testified that she could:  (1) walk for

"[m]aybe a couple minutes;" (2) stand for approximately 20, with no limitation on sitting;

and, (3) lift up to 10 pounds.  She denied being able to use the stairs to the basement

laundry room because of mold.  While standing, she could not bend forward from the

waist, kneel down, or stoop over.  She agreed that she could squat and re-stand with

---

[86] *Id.* at 340-41.
[87] *Id.* at 342-43.
[88] *Id.* at 343-44.
[89] *Id.* at 344-45.

difficulty.  She denied having problems with her memory or concentration.[90]  Regarding her daily activities, she related that sleeping was limited to five hours due to her breathing problem and the need for inhalers.  She claimed that morning hygiene care and dressing took over an hour due to breathing difficulties.[91]  She acknowledged being able to make her own meals and to do household chores, which took her "forever" to complete, and stated that she could stand to wash dishes for approximately 10 minutes before needing a break, and experienced shortness of breath while folding laundry. She also does her laundry, and hangs it on a clothes line to dry.  She also does her own grocery shopping, but has one of her daughters drive her to the store.[92]  She no longer crochets or does yard work due to allergies and hand pain.  She is able to visit with her children and grandchildren, handle her finances, pay bills, and maintain her checkbook. Her typical day involves doing as much housework as she can tolerate and watching television.[93]

Plaintiff testified that she was unable to work an 8 hour day because of shortness of breath when talking, limited, painful movement of her hands, and the need for at least six 10 to 20 minute daily breaks.[94]

Plaintiff's daughter, Michelle, testified that she sees and helps her mother daily with household chores, such as laundry, dishes, or cleaning.  She felt that plaintiff's most significant problem was her breathing; that merely walking to and from the restroom leaves her breathless; and, that plaintiff uses her inhaler four or five times a

---

[90] *Id.* at 345-47.
[91] *Id.* at 347-48.
[92] *Id.* at 348-49.
[93] *Id.* at 349-50.
[94] *Id.* at 351-52.

day.[95]  Michelle confirmed the leg swelling, and hand problems (difficulty opening jars and sodas).  Based on her observations, she felt that her mother's health situation prevented her from operating at a normal pace necessary to perform any kind of job.[96]

Another daughter, Marcia, testified that she visits her mother at least every other day.  She also felt that plaintiff's breathing was her most significant problem and confirmed shortness of breath after "a couple steps" and while doing household activities.  She further confirmed plaintiff's significant leg swelling, her complaints of numbness and pain in her hands and needing assistance to open soda cans.[97]  Marcia testified that her father does not let her mother "do laundry too often because it's downstairs and she can't walk the steps."  She acknowledged that her mother cooks.  Like her sister, Marcia also concluded that her mother could not handle a 40-hour a week job "because her health is not good enough," particularly in light of her breathing problems, as well as, problems with her legs and hands.[98]

### E.   Vocational Evidence

The vocational expert, Tony Melanson, was present during the hearing and testified that plaintiff's work as a painter qualified as skilled medium work, which was occupationally specific, without transferrable skills.[99]  At the hearing, the ALJ posed the following hypothetical question:

> [I]f we consider a hypothetical person who is about the Claimant's stated age at onset, and that would be 40 years.  This person has a limited education, and I think it's 9th rather than 10th. . . .  This individual has the

---

[95] *Id.* at 353-54. Michelle also noted that it took about 10 minutes for the inhaler to be effective.  *Id.*
[96] *Id.* at 355-58.
[97] *Id.* at 358-60.
[98] *Id.* at 360-61.
[99] *Id.* at 362-63.

work history that you just talked about, skilled but the skills don't transfer. Now, there are certain underlying impairments that would limit this person in their ability to do work-related activities.  In this particular hypothetical, this person is limited to working at a sedentary level of exertion.  The posturals are occasional, and occasional climbing and only occasional crawling.  This person needs to avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases, poor ventilation.  This person also has manipulative limitations, and the issue of handling and fingering would be limited to frequent as opposed to constant.  And again this person has skills that don't transfer so I guess we'd be talking about simple, unskilled work.  I'm assuming that the past relevant work would be definitely ruled out. . . .  [W]ould there be any unskilled, sedentary work such a person with the age, the educational background, and the work history of the Claimant, that they could do that would fit within the parameter of that hypothetical in your opinion?[100]

The vocational expert replied that under this scenario, such a person could perform security monitoring of which there were about 800 positions in the local region (about 75 miles radius of Dover, Delaware), with approximately 120,000 such positions in the national economy.  In addition, that hypothetical person could be an order clerk, another sedentary position, with about 600 such positions available locally and approximately 105,000 positions nationwide.  Further, under the hypothetical, such a person could be a telephone surveyor, for which there are roughly 750 such positions available locally and about 110,000 nationally.[101]

When asked, however, if the limitations claimed by plaintiff, as supported by the treatment records were added to the hypothetical person, the vocational expert testified such individual could not perform the jobs he proposed or any other sedentary work.[102]

## IV.  STANDARD OF REVIEW

---

[100] *Id.* at 363-64.
[101] *Id.* at 364.
[102] *Id.* at 364-65.

A.      **Motion for Summary Judgment**

Both parties filed motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56(c).  In determining the appropriateness of summary judgment, the

court must review the record as a whole and "draw all reasonable inferences in favor of

the nonmoving party, [but] may not make credibility determinations or weigh the

evidence."[103]  If the court determines that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law, summary judgment is

appropriate.[104]

B.      **Review of the ALJ's Findings**

The court must uphold the Commissioner's factual decisions if they are

supported by "substantial evidence."[105]  Substantial evidence is not a "large or

considerable amount of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."[106]  Credibility determinations

are, likewise, the province of the ALJ, and should be disturbed on review only if they are

not supported by substantial evidence.[107]  Thus, the inquiry is not whether the court

would have made the same determination, but rather, whether the ALJ's conclusion was

reasonable.  In social security cases, this substantial evidence standard applies to

motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c).[108]

---

[103] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).
[104] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).
[105] 42 U.S.C. § 405(g), 1383(c)(3).
[106] *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (internal citation omitted); *see also Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (defining substantial evidence as "more than a mere scintilla") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).
[107] *See Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)).
[108] *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

In the context of judicial review under § 405(g),

"[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion."[109]

Where, for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[110]

## V.  DISCUSSION

### A.  Disability Determination Standard

A claimant – in order to establish SSI eligibility – bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than 12 months.[111]  Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy.[112] Furthermore, a "physical or mental impairment" is an impairment that results from

---

[109] *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 f.2d 110, 114 (3d Cir. 1983)).
[110] *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).
[111] 42 U.S.C. § 423(d)(1)(A).
[112] 42 U.S.C. § 423(d)(2)(A).

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.[113]

## B.  Five-Step Test.

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[114]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
>
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
>
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[115]

If the ALJ determines that a claimant is disabled at any step in the sequence, the

---

[113] 42 U.S.C. § 423(d)(3).
[114] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).
[115] *Plummer*, 186 F.3d at 427.

analysis stops.[116]

### B. Application of the Five-Step Test

In the present case, step one of the five-part test to determine whether a person is disabled is not at issue:  The ALJ determined that plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability on March 1, 2005. Step two is in contention because, although the ALJ qualified plaintiff's obesity, chronic obstructive pulmonary disease, and bilateral carpal tunnel release status post surgical releases as "severe" impairments, as plaintiff argues should also have included plaintiff's leg problems among those severe impairments.  Step three is also in contention as plaintiff allegedly suffers from impairments purportedly severe enough to preclude any gainful work.  Since the ALJ found otherwise, she moved to step four and found that plaintiff is unable to perform her past relevant work because it exceeds her residual functional capacity.  The other issue in this case concerns the fifth step: whether plaintiff can perform other existing work in the national economy.  The ALJ found that,

> [i]f the claimant had the residual functional capacity to perform the full
> range of sedentary work, a finding of 'not disabled' would be directed by
> Medical-Vocational Rule 201-28.  However, the claimant's ability to
> perform all or substantially all of the requirements of this level of work has
> been impeded by additional limitations.  To determine the extent to which
> these limitations erode the unskilled sedentary occupational base, the
> Administrative Law Judge asked the vocational expert whether jobs exists
> in the national economy for an individual with the claimant's age,
> education, work experience, and residual functional capacity.  The
> vocational expert testified that given all of these factors the individual
> would be able to perform the requirements of representative occupations
> such as . . . [security monitor, order clerk, and telephone surveyor] . . . .

---

[116] *See* 20 C.F.R § 404.1520(a).

> Pursuant to SSR 00-4-p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of 'not disabled' is therefore appropriate under the framework of the above-cited rule.[117]

Plaintiff challenges the ALJ's findings on five grounds.  First, that the ALJ failed to properly evaluate the opinion of plaintiff's primary care physician, Dr. Vineet Puri. Second, that the ALJ erred in her evaluation of plaintiff's credibility. Third, that the ALJ erred by failing to list plaintiff's leg problems as a severe impairment at step 2 of the sequential evaluation process.  Fourth, that the ALJ failed to properly evaluate plaintiff's obesity.  Fifth, that the ALJ failed to properly consider the combination of plaintiff's impairments on her ability to work.

### C.  Evaluation of the Opinion of Plaintiff's Treating Physician

In determining the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts.[118]  In particular, regarding the weight given to a treating physician's medical opinion, the Third Circuit has stated that "treating physicians reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"[119]  As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating

---

[117] D.I. 14 at 22-23.
[118] *See Richardson*, 402 U.S. at 399.
[119] *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir. 1987)).

physician than to the findings of a physician who has examined the claimant only once or not at all."[120]  Indeed, a treating physician's opinion is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."[121]

The ALJ, however, may reject a treating physician's opinion if it is based on "contradictory medical evidence."[122]  In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion."[123]

Plaintiff argues that the ALJ failed to properly evaluate the opinion of her primary care physician, Dr. Vineet Puri, who opined on November 7, 2006 that her multiple impairments precluded any kind of substantial gainful work.

The ALJ recited Dr. Puri's November 7, 2006 opinion that:

the claimant could not lift over ten pounds and that problems with her legs, breathing, and hands would interfere with her ability to maintain regular work.  He wrote that he felt any type of job that required her to exert herself on an eight hour basis would be prohibited due to getting out of breath on exertion; she would not be able to stand for any kind of job that would require regular standing or regular repetitive use of her hands; fatigue would probably substantially interfere with her ability to work competitively at any kind of job; and would not be able to do any kind of work on a regular forty hour a week basis because of the combination of

---

[120] *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).
[121] *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)).
[122] *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).
[123] *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008); *see also* Social Security Regulation ("S.S.R.") 96-2p, 1996 SSR LEXIS 9, at *9-*10 (July 2, 1996) (noting that "a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

her problems or work on a consistent basis since March, 2004.[124]

The ALJ stated that while:

> A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance; and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight. . . . Statements that a claimant is "disabled", "unable to work" can or cannot perform a past job, meets a listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein and in the *Dictionary of Occupational Titles*.[125]

The ALJ also stated that Dr. Puri's opinion "did not refer to any pulmonary functional testing or testing for fine manipulation or grasping to support his opinion that the claimant was incapable of performing all work" and concluded that "the record fails to support the doctor's opinion that the claimant is incapable of all work."[126]  Other than commenting that determination of disability being an administrative finding rather than a medical opinion, the ALJ did not enunciate what weight, if any, she gave to Dr. Puri's opinion.

In contrast, the ALJ assigned significant weight to Dr. Salomon's March 18, 2007 opinion and his March 17, 2007 Physical Residual Functional Capacity Assessment. Significant weight was also assigned to Dr. Lifrak's July 6, 2005 report, as the ALJ concluded that the opinions of Drs. Salomon and Lifrak were "well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes, which provides a reasonable

---

[124] D.I. 14 at 20.  The date of Dr. Puri's opinion was inadvertently listed as November 3, 2006 in the ALJ's decision.
[125] D.I. 14 at 20-21 (citation omitted).
[126] *Id.* at 21.

33

basis for claimant's chronic symptoms and resulting limitations."[127]  The ALJ determined

that those "opinions are not inconsistent with other substantial evidence of record . . .

[and] these physicians are examining and medical expert sources who are familiar with

Social Security Rules and Regulations and legal standards set forth therein and best

able to provide a superior analysis of the claimant's impairments and resulting

limitations."[128]

The ALJ likewise assigned significant weight to a state medical consultant's July

8, 2005 Physical Residual Functional capacity Assessment:

> because it was based upon a [thorough] review of the evidence and
> familiarity with the Social Security Rules and Regulations and legal
> standards set forth therein . . . [and] is well-supported by the medical
> evidence, including the claimant's medical history and clinical and
> objective signs and findings as well as detailed treatment notes, which
> provides a reasonable basis for claimant's chronic symptoms and resulting
> limitations.  Moreover, this opinion is not inconsistent with other
> substantial evidence of record.[129]

Plaintiff does not dispute the point that the ALJ, not Dr. Puri, must make the

determination of whether plaintiff is "disabled" but argues the Dr. Puri's opinion

concerning plaintiff's impairments should have been given controlling weight as it was

supported by medically acceptable clinical and laboratory diagnostic techniques.

The court notes that Dr. Lifrak's examination of plaintiff on June 29, 2005 and the

state agency examiner's RFC is dated July 8, 2005 (which was affirmed October 11,

2005) occurred before much of the evidence in the record was complete.  For instance,

subsequently, plaintiff was examined by Dr. Barnett for pain in both legs and swollen

---

[127] *Id.*
[128] *Id.*
[129] *Id.*

ankles, with symptoms worsening over time.  His found corded varicosities in both legs, and an ultrasound revealed a large saphenous vein with numerous very large incompetent tributaries from the saphenous sheath and leading to the corded varicosities visible on plaintiff's legs.  Consequently, Dr. Barnett performed the VNUS procedure.  Subsequent reevaluations by Dr. Barnett noted a decrease in the swelling of her left leg and an ultrasound which showed no evidence of deep venous thrombosis, though on August 24, 2006 she complained of severe swelling of her foot by day's end.  On October 5, 2006, her last visit to Dr. Barnett noted plaintiff's complaint of swelling after standing for more than 15 minutes at a time, which concerned her, but that she wearing a stocking helped with the leg swelling.[130]

On April 18, 2006, plaintiff was admitted to Kent General Hospital due to breathing problems, with a notation that she had recently been treated for an upper respiratory tract infection and exacerbation of chronic obstructive pulmonary disease.[131]  Her April 20, 2006 discharge diagnoses included pneumonia in the left lower lung and chronic obstructive pulmonary disease exacerbation.[132]  A March 15, 2006 record also indicates that plaintiff was taken by ambulance to the emergency room of the same hospital complaining of a productive cough and notes abdominal pain/distention and wheezing.[133]  On October 2, 2006, plaintiff was seen by Dr. Lakhani for an evaluation of, *inter alia*, uncontrolled asthma and suspected allergic rhinitis at which time pulmonary function and allergy tests were performed.[134]  Despite numerous medications, plaintiff

---

[130] *Id.* at 145-46.
[131] *Id.* at 175.
[132] *Id.* at 168.
[133] *Id.* at 161-65.
[134] *Id.* at 125-26.

reported continuous, regular use of a rescue inhaler sometimes up to 8-10 times daily and prednisone 3-4 times a year to breath.  The spirometry study conducted by Dr. Lakhani revealed significant impairment in the upper and lower airways, and the combination of obstructive and restrictive lung disease.[135]  Dr. Lakhani assessed that plaintiff had moderate, persistent asthma complicated by COPD, currently not controlled and increased the strength and dosage her Advair prescription.[136]  When examined by Dr. Grewal in October 2006 for a cardiac evaluation, plaintiff complained of worsening episodes of tightness in her chest while doing household chores, and at rest.  Dr. Grewal performed an EKG, diagnosed, *inter alia*, coronary artery disease with exertional angina, and suggested a cardiac catheterization and an echocardiogram.[137]

During her November 7, 2006 visit with Dr. Puri, he diagnosed permanent damage to her median nerve.[138]  On November 15, 2006, nearly a year after the second of her two second carpal tunnel release surgeries, plaintiff returned to Dr. Schwartz with continued complaints of pain bilaterally in her hands and tenderness at her carpal tunnel surgical sites.[139]  Finally, a June 13, 2007 report from Dr. Tamesis indicated a chest X-ray was taken and a diagnosis "chest pains/ Dy[s]pnea."[140]

Because the above examinations and tests were conducted after Dr. Lifrak's examination and the state medical consultant's RFC, they would not have been part of

---

[135] *Id.* at 141-42.
[136] *Id.* at 143.  Plaintiff testified that Dr. Lakhani prescribed the strongest Advair dosage and that the dosage of the remainder of her medications increased due to worsening breathing problems.  *Id.* at 334, 336.
[137] *Id.* at 128-30.  Plaintiff was referred to Dr. Grewal by Dr. Barnett, to whom Dr. Grewal reported his findings.  However, Dr. Puri was also "cc-ed" on Dr. Grewal's letter to Dr. Barnett.  *See id.* at 130
[138] *Id.* at 138.
[139] *Id.* at 150.
[140] *Id.* at 315.

those physicians' consideration.  With the exception of plaintiff's November 15, 2006

office visit to Dr. Schwartz and Dr. Tamesis' report and diagnosis, however, Dr. Puri

was able to consider those records in forming his opinion.  Though the ALJ stated that

Dr. Puri did not refer to any pulmonary functional testing to support his opinion, he

stated that plaintiff "has been seen by Dr. Lakhani for her allergies and asthma and the

COPD.  Her condition has been getting worse despite treatment."[141]  It was Dr. Lakhani

who performed plaintiff's pulmonary function test indicating decreased function and who

increased the strength of her Advair prescription which supports the conclusion of a

worsening of her breathing problems.  The ALJ also criticized Dr. Puri for not referring to

any functional testing or testing for fine manipulation or grasping to support his opinion.

While accurate, he stated that "she has had carpal-tunnel surgery because of chronic

pains in her wrists and despite the surgery she still complains of pain in her wrists"[142]

and noted her stated inability to open anything with her hands.[143]

The court determines that the ALJ failed to sufficiently describe what weight, if

any, she assigned to Dr. Puri's opinion and what contradictory evidence from Dr.

Lifrak's examination and report and the state agency consultant's RFC (neither of whom

were privy to the entire record of the case) or from Dr. Salomon's opinion (who

presumably had access to all, or substantially all, of the record).  Here, the ALJ

disregarded the conclusions of plaintiff's treating physician, who was also familiar with,

and received the reports of, plaintiff's other treating/examining physicians (Drs.

---

[141] *Id.* at 136.
[142] *Id.*
[143] *Id.* at 138.

Schwartz, Barnett, Lakhani, and Grewal) in favor of other doctors.  "Where there is

conflicting probative evidence in the record, we recognize a particularly acute need for

an explanation of the reasoning behind the ALJ's conclusions, and will vacate or

remand a case where such an explanation is not provided."[144]  "Although the ALJ may

weigh the credibility of the evidence, he must give some indication of the evidence that

he rejects and his reason(s) for discounting that evidence."[145]  For these reasons, the

court recommends remanding to the ALJ for further discussion on why, other than

familiarity with Social Security Rules and Regulations and the legal standards set forth

there, the opinions of the Drs. Salomon, Lifrak, and the state medical consultant were

given more weight than those of plaintiff's treating physician, Dr. Puri.

### D.  Credibility Determinations

Plaintiff also asserts that the ALJ improperly discredited plaintiff's testimony and

subjective complaints.  The statute requires deference to the ALJ's findings of fact so

long as those findings are supported by substantial evidence of record.[146]  Although

"[a]n ALJ must give serious consideration to claimant's subjective complaints of pain,"[147]

subjective complaints of pain "do not in themselves *constitute* disability."[148]  Subjective

complaints of pain are given "great weight" unless there is conflicting medical

evidence.[149]  When a claimant's subjective complaints of pain indicate a greater severity

of impairment than the objective medical evidence supports, the ALJ can give weight to

---

[144] *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).
[145] *Id.* at 43.
[146] *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).
[147] *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d. Cir. 1993).
[148] *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir. 1984) (emphasis in original).
[149] *See Mason*, 994 F.2d at 1067-68.

38

factors such as physician's reports and claimant's daily activities.[150]

In determining that plaintiff was not entirely credible, the ALJ recited that:

The claimant complained of carpal tunnel syndrome with cramping and tingling, COPD with coughing and wheezing, varicose veins, leg swelling, hypertension that had recently been diagnosed, and hypothyroidism that was controlled with medication.  The claimant testified that she was able to walk for a couple of minutes and avoided stairs, stand for twenty minutes, sit for an unlimited time, lift ten pounds, can hold a knife and fork and feed herself, hold a hair brush and brush her teeth, hold a pen, all for short periods, and she cannot bend, kneel, squat, or stoop.  She gets hand cramps if she tries to button, zipper, or pick up coins.  She can open car doors, but has problems with door knobs and can hold a car steering wheel to drive.  The claimant's daughter's testimony essentially corroborated claimant's testimony regarding her subjective complaints and functional limitations.  She denied any medication side effects.[151]

With regard to the credibility of plaintiff's testimony, the ALJ stated that:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to product the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible in light of the reports of the treating and examining practitioners and the findings made on examination.[152]

In support of her finding that plaintiff's "allegations of disabling pain are out of proportion with the record,"[153] the ALJ noted plaintiff's demeanor at the hearing; clinical findings from April and July 2005 and that plaintiff had performed babysitting in the summer of 2005; her lack of hospitalization for her impairments (other than for carpal tunnel release), the level of care for her impairments and history of smoking; and her daily activities.

---

[150] *See* 20 C.F.R. § 404.1529(c)(3).
[151] D.I. 14 at 18-19.
[152] *Id.* at 19.
[153] *Id.*

The ALJ stated that "[a]t the hearing, the claimant sat, stood, and ambulated normally and despite her testimony of shortness of breath did not exhibit any such incidents during the hearing and did not use an inhaler."[154]  Other than noting plaintiff's demeanor, the ALJ did not state what weight she assigned that demeanor.  The Third Circuit has criticized an ALJ's determination of disability based on his or her observation of a plaintiff at the hearing.[155]  In *Van Horn*,

> [The claimant] and his witnesses testified that he was emotionally disabled.  The reports of Van Horn's physician and of the consultative psychiatrist supported this claim.  No conflicting medical opinions were submitted.  Nor did the Secretary present any evidence indicating that individuals with Van Horn's uncontested emotional disabilities are able to work.  To decide as he did, the ALJ must have ignored all of the evidence indicating that Van Horn was emotionally disabled and that this disability prevented him from working. . . .  [T]he ALJ never specifically stated that he did not find [the testimony of Van Horn and his witnesses] credible.[156]

The Third Circuit concluded that the only way the ALJ could have reached his conclusion that the claimant was not disabled was "by relying solely on his own non-expert observations at the hearing–in other words, by relying on the roundly condemned 'sit and squirm' method of deciding disability cases."[157]  Unlike the ALJ in *Van Horn*, the ALJ here did not base her credibility determination solely on plaintiff's comportment at the hearing, however, based on this precedent plaintiff's ability to sit through the hearing is "entitled to little or no weight."[158]

---

[154] *Id.*

[155] *See Van Horn v. Schwieker*, 717 F.2d 871, 874 (3d Cir. 1983).

[156] *Van Horn*, 717 F.2d at 873 (footnote omitted).

[157] *Van Horn*, 717 F.2d at 874; *id.* at 874 n.3 ("'In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of the index, the claim is denied.'" (quoting *Freeman v. Schwieker*, 681 F.2d 727, 731 (11th Cir. 1982) ("The ALJ's decision improperly suggests that unless the pain is visible to the ALJ at the hearing, it is proper to deny the claim."))).

[158] *Van Horn*, 717 F.2d at 874.

The ALJ also listed reports of Drs. Schwartz, Lifrak, and Puri, as well as, plaintiff's babysitting in the summer of 2005 as reasons to question her credibility. The ALJ noted the April 12, 2005 report by Dr. Schwartz that plaintiff "had no atrophy of the hand intrinsics and no dysvascular changes.  Deep tendon reflexes were symmetric and strength for the upper extremities were 5/5 and symmetric" and Dr. Lifrak's July 6, 2005 note that she "had no evidence of cyanosis or clubbing of the digits.  There was no evidence of asymmetrical muscle atrophy or wasting seen or joint effusion.  Grip strength was 5/5 on the left at forty pounds and thirty-five pounds on the left.  Muscle tone in the lower extremities was 5/5 bilaterally."[159]  The ALJ also pointed to Dr. Puri's July 14, 2005 progress notes reporting that "the claimant had normal appearance of joints, normal muscle mass, no crepitus, normal range of motion, normal gait, and 5/5 strength in all extremities.  Her sensory system was intact and deep tendon reflexes were normal.  She had normal movements with breathing with vesicular breath sounds, no rales or rhonchi."[160]  Finally, the ALJ noted Dr. Puri's comment in his November 7, 2006 physician's statement that plaintiff had performed babysitting in the summer of 2005."[161]  The ALJ concluded that those "findings are indicative that the claimant's complaints are not fully substantiated by the objective medical conclusions and her symptoms may not have been as limiting as the claimant has alleged in connection with this application."[162]

Not discussed in connection with these reports is that plaintiff's April 12, 2005

---

[159] D.I. 14 at 19.
[160] *Id.*
[161] *Id.*
[162] *Id.*

needle EMG/nerve conduction study revealing moderately severe bilateral carpal tunnel syndrom and marked axonal loss bilaterally which resulted in Dr. Schwartz performing right carpal tunnel release surgery.[163]  Also, despite multiple sessions of physical therapy[164] and left carpal tunnel release surgery, plaintiff continued to report to her physicians in late 2006 bilateral hand pain and tenderness at her carpal tunnel surgical sites and limited hand function.[165]  Also, not evaluated are the objective diagnostic test results from plaintiff's pulmonary function test which showed reduced pulmonary function demonstrating "significant impairment in the upper and lower airways, the combination of obstructive and restrictive lung disease."[166]  Lastly, with regard to plaintiff's babysitting in the summer of 2005, it was a part time job caring for an infant.[167] Dr. Puri's physician's statement cited by the ALJ, reported that plaintiff reported "that with this non-exertional job she would frequently get short of breath with a small child."[168]

Next, the ALJ also noted that, other than for carpal tunnel release surgery, the record failed to show that the plaintiff had been hospitalized for her impairments or that she had "received active care other than for conservative routine maintenance."  She stated that plaintiff had been "hospitalized for respiratory failure after a gynecological procedure, but not for her COPD individually despite requiring use of inhalers and

---

[163] *Id.* at 86, 90.
[164] *Id.* at 106-110.
[165] *Id.* at 138, 150.
[166] *Id.* at 142.
[167] *Id.* at 330.  The ALJ and plaintiff's attorney agreed at the hearing that babysitting was neither past relevant work nor SGA.  *Id.* at 331.
[168] *Id* at 137.

steroids."[169]  The ALJ also considered the fact that "[d]espite her complaints of shortness of breath, she continued to smoke cigarettes until three weeks prior to the hearing.  This suggests that the claimant's symptoms may not have been as serious as has been alleged in connection with this application and appeal."[170]

As the ALJ noted, plaintiff's hand and wrist pain required two hospital admissions for surgery which, according to plaintiff's statements contained in her physician's records, did not alleviate her paint.  In addition to those hospitalizations, and that for respiratory failure referenced by the ALJ, the record of her April 18, 2006 hospitalization recites that "[s]he was recently treated for a[n] upper respiratory tract infection and exacerbation of chronic obstructive pulmonary disease."[171]  There is also a Kent General Hospital emergency room record indicating that she was taken there by ambulance due to a productive cough and wheezing.[172]  Although the ALJ stated that "[t]here have been no significant increase or changes in prescribed medication reflective of an uncontrolled condition,"[173] the record indicates that following her pulmonary function test, Dr. Lakhani increased her prescription from Advair 250/50 to Advair 500/50,[174] which plaintiff testified was the highest dosage available.[175]

With regard to plaintiff's history of smoking, the court notes that cigarette smoking is addictive.  Plaintiff reported to Dr. Grewal in early October 2006 that she has smoked 1 ½ packs of cigarettes a day for *thirty years* but had recently reduced to ½

---

[169] *Id.*
[170] *Id.*
[171] *Id.* at 175.
[172] *Id.* at 160-61.
[173] *Id.* at 19.
[174] *Id.* at 143.
[175] *Id.* at 334.

43

pack a day.[176]  Similarly, she reported to Dr. Lakhani that same month her history of

smoking more than a pack of cigarettes daily and her recent reduction in amount of

smoking.[177]  And, as the ALJ noted, plaintiff testified that she had completely stopped

smoking approximately three weeks prior to the hearing with no episodes of relapse but

had not noticed a resultant decrease in breathing problems.[178]

The ALJ also cited abilities plaintiff admitted to in her May 20, 2005 adult function

report "which are not limited to the extent one would expect, given the complaints of

disabling symptoms and limitations."[179]  According to that report, plaintiff was able to:

> clean the house, perform yard work, watch television, cook meals for her
> granddaughter and provide childcare for her during the week, help her
> granddaughter with homework, get her ready for school, take care of her
> personal care, vacuum, dust, sweep and mop the floors, do laundry, go
> grocery shopping, pay bills, count change, handle a savings account, use
> a checkbook and money orders, plant [flowers], paint and perform
> needlepoint.[180]

The ALJ also noted that, at the hearing, plaintiff testified that:

> she lives alone, and is able to take care of her personal hygiene, prepare
> her meals, perform all household cleaning (although it takes her awhile to
> do this), watch television, do her laundry and hang her wash on a
> clothesline, go grocery shopping with her daughter, and maintain her
> finances.  However, due to her impairment, she has given up crocheting
> and working in her yard.[181]

The ALJ concluded that "[t]he overall evidence suggests that the claimant [has]

the ability to care for herself and maintain her home.  Furthermore, the performance of

the claimant's daily activities as described is not inconsistent with the performance of

---

[176] *Id.* at 129 (emphasis added).
[177] *Id.* at 142.
[178] *Id.* at 335.
[179] *Id.* at 20.
[180] *Id.*
[181] *Id.*

many basic work activities."[182]

The Third Circuit has stated that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity"[183] but the court notes that consideration of plaintiff's daily activities with regard to a credibility determination is not improper.[184]

Although the recitation of plaintiff's activities in her adult function report is correct, the ALJ neglected to note that, in that same document, plaintiff wrote that she sometimes awakes in the night to use an inhaler due to breathing problems, and that she gets out of breath quickly climbing stairs, walking, and with conversation. She reported getting out of breath merely walking from room to room, after which she needed to use her inhaler and rest for 10 to 20 minutes to recuperate. She also reported her severe hand pain made it difficult to do her hair, lift object, or even hold a pencil to write. Plaintiff also wrote that "I can not do the things as good or as long as before because of shortness of breath or bad pains in my hands" and that "I can't do many activities because of shortness of breath or pain in hands so I don't do many activities any more."[185]

At the hearing, plaintiff testified that could hold a knife and fork to feed herself, as the ALJ noted, but that she had to hold the utensils loosely. If she were filling out a job application she could hold a pen but "could not finish the whole paper without taking

---

[182] *Id.*

[183] *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981).

[184] 20 C.F.R. § 416.929(c)(3)(i) (stating that a claimant's daily activities are among factors relevant to evaluating symptoms, including pain).

[185] D.I. 14 at 78-84. Plaintiff reiterated at the hearing that she awakes at night due to breathing problems and is only able to sleep for, at most, five hours at a time. *Id.* at 347.

breaks."[186]  Although plaintiff generally is able to take care of her personal hygiene, she

stated that morning personal care takes her over an hour due to breathing problems.

With regard to household chores, she gets out of breath and has to take breaks.  For

instance, she could only do dishes for approximately 10 minutes before needing to sit

down.[187]

The ALJ acknowledged that the testimony of plaintiff's daughters "essentially

corroborated claimant's testimony regarding her subjective complaints and functional

limitations" but the also testified to their observations of her activities and/or the help

they provided their mother at home.  Although plaintiff testified that she does her own

laundry, her daughter Michelle testified that on a daily basis she would "do her laundry,

dishes, pick up around the house . . . [things] that she can't do or that would take her

probably four times as long as me if she had to do it."[188]  Her daughter Marcia, who sees

her mother every other day, testified that "[plaintiff] doesn't do laundry.  We – my dad

doesn't let her do laundry too often because it's downstairs and she can't walk the

steps."[189]

It is the responsibility fo the ALJ to weigh the evidence and make determinations

on contradicting evidence.  However, if contradicting evidence is in the record, the ALJ

must explain how she came to her conclusions.  Furthermore, the ALJ must explain

what evidence was discounted.  For further discussion on these issues related to

---

[186] *Id.* at 341.
[187] *Id.* at 348-49.
[188] *Id.* at 353.
[189] *Id.* at 360.  Plaintiff testified that she could not climb stairs but at her house "we don't really have to use them.  They're the stairs to in [sic] my laundry room.  So I don't go down there . . . because of the stairs."  *Id.* at 346.

plaintiff's credibility, it is recommended that the case is remanded.

### E. Evaluation of Plaintiff's Leg Impairment

Plaintiff contends that the ALJ erred in her determination that plaintiff's leg impairment was not severe.

The ALJ noted that:

> On September 5, 2006, Thomas P. Barnett, M.D., reported that the claimant complained of left lower leg swelling when she stood for more than fifteen minutes since March, 2006.  She did not have evidence of deep venous thrombosis.  She was found to have probable superficial phlebitis because her leg was tender.  On October 5, 2006, it was reported for a follow up visit that she had been wearing stocking which helped.[190]

> [Plaintiff's] left leg swelling resolved in 2006, and she no longer requires medication.  The claimant was treated for leg swelling beginning February 2006 by T.P. Barnett, M.D., who administ[e]red testing and found no evidence of deep venous thrombosis (DVT), but felt her problem was likely superficial phlebitis.  By September 2006, he noted significantly less swelling with treatment, consisting of antibiotics and ace bandage daily.[191]

The court disagrees with plaintiff's contention that the ALJ erred in not finding plaintiff's leg impairment to be severe and determines that substantial evidence supports that conclusion.  Dr. Lifrak's June 29, 2005 exam indicated that she could ambulate without the aid of assistive device, muscle tone in the lower extremities was 5/5 bilaterally, and no evidence of deep venous thrombosis, stasis ulceration or edema formation in the extremities.[192]  Dr. Puri's July 14, 2005 evaluation noted a normal gait, power 5/5 in all extremities, normal appearance of joints, and normal muscle mass with no pedal edema.[193]  Similar findings were reported by Dr. Puri at plaintiff's office visits

---

[190] D.I. 14 at 16.
[191] *Id.* at 17.
[192] *Id.* at 94-95.
[193] *Id.* at 112.

on October 26, 2005, November 8, 2005, and November 7, 2006.[194]

Her visits to Dr. Barnett began in March 2006 for evaluation of longstanding venous insufficiency with complaint of gradual worsening of leg cramps, restlessness, and throbbing and swollen ankles.  After an ultrasound examination, an outpatient VNUS was performed on August 3, 2006.[195]  On August 15, 2006, plaintiff was reevaluated for swelling and some pain at her previous VNUS site.  Dr. Barnett determined there was evidence of superficial phlebitis to her lower calf area for which antibiotics, rest, and warm compresses were prescribed.  By August 24, 2006, plaintiff reported less swelling with mild decrease in tenderness, but severe foot swelling in the evening, which resolved overnight.  Examination revealed that the area of superficial phlebitis was much softer and more mobile than before.  Aspirin was prescribed to help reabsorb the phlebitis, an ACE bandage and elevation of the leg was recommended for her swelling and the remaining prescriptions were continued.[196]  Although during the September 5, 2006 office visit plaintiff complained of some swelling in her left leg, Dr. Barnett noted that the post VNUS procedure ultrasound after her VNUS procedure showed no evidence of DVT.  He diagnosed superficial phlebitis, prescribed antibiotics, aspirin, and pain medication.  Two days later, her left leg remained a little swollen but much less so than before.  Again, there was no evidence of DVT.  By September 19, 2006, plaintiff was feeling much better and her swelling was significantly less.[197]  On October 5, 2006, she returned advising that although swelling occurred when she

---

[194] *Id.* at 120, 117, 139.
[195] *Id.* at 145-46.
[196] *Id.* at 146.
[197] *Id.* at 147.

stands for more than 15 minutes, the support stocking helped with the swelling.[198]  On

October 3, 2006, when evaluated by Dr. Grewal, he noted only "trace edema, left more

than right."[199]

In light of the above evidence, the court recommends denial of plaintiff's motion

on the issue of the ALJ's assessment of her leg impairment.

### F. Evaluation of Plaintiff's Obesity

Plaintiff contends that, although the ALJ determined that plaintiff's obesity was a

severe impairment, she did not consider Social Security Ruling ("SSR") 02-1p, the

agency's policy interpretation ruling in evaluating obesity cases, and failed to explain

why plaintiff's obesity failed to meet or equal a listing.

First, the court notes that plaintiff, through her attorney, conceded at the

administrative hearing that she did not have an impairment which met any listing.  At the

beginning of the hearing, the ALJ asked "[n]ow, what would you like to tell me in

opening?  For example, if you contend that your client meets any listing."[200]  Plaintiff's

counsel responded, "I don't think she meets the listings.  The issue in this case, as in

many cases, will turn upon the credibility of my client."[201]  Also, contrary to plaintiff's

assertion that the ALJ had not addressed SSR 02-1p, the ALJ specifically noted her

consideration of that ruling, stating that:

> Social Security Ruling 02-1p recognizes that the effects of obesity must be
> considered when evaluating disability claims, since the effect of obesity in
> combination with other impairments can be greater than the effects of

---

[198] *Id.* at 148.
[199] *Id.* at 130.
[200] D.I. 14 at 322.
[201] *Id.*

each impairment considered separately.  Thus, any additional and
cumulative effects of the claimant's obesity must be considered in
assessing the claimant's impairments under each step of the sequential
evaluation process.  These considerations have been taken into account
in reaching the conclusions herein.[202]

The court finds the Third Circuit's opinion in *Rutherford v. Barnhart* instructive.[203]
There, plaintiff appealed an adverse disability ruling alleging, *inter alia*, that the ALJ did
not consider her obesity throughout the disability determination.[204]  The court noted that
although the plaintiff "did not raise obesity as an impairment or limitation before the ALJ,
she points out that the medical records available to the ALJ indicate her height of 5'2"
and approximate weight of 245."[205]  Although SSR 00-3p (superceded by SSR 02-1p
without substantive change) required consideration of obesity at various points in the
five-step analysis, the court disagreed with the argument that failure to explicitly
consider plaintiff's obesity requires remand.  The Third Circuit reasoned that:

> Rutherford never mentioned obesity as a condition that contributed to her
> inability to work, even when asked directly by the ALJ to describe her
> impairments. So even if we assume-in accordance with common
> sense-that the administrative record's evidence of Rutherford's 5'2" height
> and her weight of some 245 pounds sufficed to alert the ALJ that obesity
> could be a factor, Rutherford has not specified how that factor would affect
> the five-step analysis undertaken by the ALJ, beyond an assertion that her
> weight makes it more difficult for her to stand, walk and manipulate her
> hands and fingers. That generalized response is not enough to require a
> remand, particularly when the administrative record indicates clearly that
> the ALJ relied on the voluminous medical evidence as a basis for his
> findings regarding her limitations and impairments. Because her doctors
> must also be viewed as aware of Rutherford's obvious obesity, we find
> that the ALJ's adoption of their conclusions constitutes a satisfactory if
> indirect consideration of that condition.[206]

---

[202] *Id.* at 17.
[203] 399 F.3d 546 (3d Cir. 2005).
[204] *Id.* at 552.
[205] *Id.* at 552.
[206] *Id.* at 553 (footnote omitted).

Similarly here, in addition to her attorney's representation that she did not have
impairments that met a listing, plaintiff did not raise obesity as a disabling condition at
the hearing before the ALJ.  In the section of her brief directed at the ALJ's evaluation of
her obesity, plaintiff, like Rutherford, does not point to any medical evidence in support
of her argument concerning the impact of her obesity, and merely asserts that "the
evidence establishes that [plaintiff's] obesity and shortness of breath limit her ability to
stand, walk, and engage in postural movements."  Moreover, Dr. Puri's November 7,
2006 physician's statement, which catalogs plaintiff's asthma, COPD, hypothyroidism,
carpal tunnel surgery, allergies, and leg problems does not mention obesity as an
impairment or limitation.

Despite those failures, the ALJ noted the requirements of SSR 02-1p, explained
that plaintiff's height and weight was consistent with the relevant definition of obesity,
and explained her consideration of any additional and cumulative effects of plaintiff's
obesity combined with her other impairments:

> The claimant weighs approximately 251 pounds and is 68.75 inches tall,
> giving the claimant a body mass index of 37.3, which is consistent with the
> clinical guidelines issued by the National Institutes of Health defining
> obesity.  Although the claimant's obesity has been found to be a severe
> impairment, to be considered disabling, obesity must limit the claimant's
> physical ability to perform basic work activities.  While the claimant's
> obesity may increase the severity of her impairments, it does not prevent
> her from ambulating effectively or from breathing properly.  As . . .
> reported above, the claimant has no limitation in her ability to perform
> gross or fine movements, therefore, the condition has not limited her hand
> and finger dexterity.  Nor has there been medical evidence presented that
> her obesity prevents her from performing routine movements and
> necessary physical activity in an ordinary work environment on a regular
> or continuing basis.  The claimant does not have any other significant
> medical conditions associated with obesity, such as cardiovascular
> impairment, diabetes, arthritis, severe respiratory insufficiencies, gastric
> disorders, kidney or liver disorders or severe fatigue which combined

> could possibly be considered disabling.  As a result, the claimant's obesity, combined with her severe impairments does not prevent her from performing all work activities."[207]

Consequently, the court rejects plaintiff's argument that the ALJ failed to properly evaluate her obesity and recommends granting defendant's motion for summary judgment on that issue.

## G.  Evaluation of the Combination of Plaintiff's Impairments

Lastly, plaintiff contends that remand is warranted due to the ALJ's purported failure to properly evaluate the combination of plaintiff's impairments.  The court disagrees.

The statute recites:

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.  If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.[208]

The record indicates that the ALJ properly considered the effects of plaintiff's impairments separately and in combination throughout her decision.  Describing the determinations to be made at step two, the ALJ wrote that:

> An impairment or *combination of impairments* is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or *combination of impairments* is 'not severe' when medical and other evidence establish only a slight abnormality or *a combination of slight abnormalities* that

---

[207] D.I. 14 at 20.
[208] 42 U.S.C. § 1382c(a)(3)(G).

would have not more than a minimal effect on an individual's ability to work.[209]

The ALJ made the determination that plaintiff's obesity, chronic obstructive pulmonary disease, and bilateral carpal tunnel release status post surgical releases were severe impairments.[210]  The ALJ explicitly listed each of the plaintiff's additional conditions and that they were all considered:

> The undersigned took into consideration *all the claimant's other diagnosed conditions*, including allergies, hypertension, hypothyroidism, GERD, and left leg swelling, and finds that there is minimal clinical evidence to corroborate or support any finding of significant vocational impact related [to] them.  Her allergies, hypertension, hypothyroidism, and GERD are generally controlled with medication, according to her testimony and her treatment records, and her left leg swelling resolved in 2006, and she no longer requires medication.  The claimant was treated for leg swelling beginning February 2006 by T.P. Barnett, M.D., who administered testing and found no evidence of deep venous thrombosis (DVT), but felt her problem was likely superficial phlebitis.  By September 2006, he noted significantly less swelling with treatment, consisting of antibiotics and ace bandage daily.[211]

At step three, the ALJ found that the plaintiff "does not have an impairment *or combination of impairments* that meets or medically equals one of the listed impairments in 20 CRF Part 404, Subpart P, Appendix 1."[212]  When determining plaintiff's RFC, the ALJ "careful[ly] consider[ed] . . . *the entire record*" and "considered *all symptoms* at the extent to which these symptoms can reasonably be accepted as

---

[209] *Id.* at 14 (emphasis added).
[210] *Id.* at 15.
[211] *Id.* at 17 (emphasis added).
[212] *Id.* (emphasis added).  At this step the ALJ also emphasized SSR 02-1p and its specific requirement that "any additional and cumulative effects of the claimant's obesity must be considered in assessing the claimant's impairments under each step of the sequential evaluation process.  These considerations have been taken into account in reaching the conclusions herein.  *Id.*

consistent with the objective medical evidence and other evidence."[213]  The ALJ

reiterated that plaintiff complained of "carpal tunnel syndrome with cramping and

tingling, COPD with coughing and wheezing, varicose veins, leg swelling, hypertension

that had recently been diagnosed, and hypothyroidism that was controlled with

medication."[214]  "After considering the evidence of record" the ALJ found that plaintiff's

"medically determinable *impairments* could reasonably be expected to produce the

alleged symptoms," but she determined the limitations alleged by plaintiff were not as

debilitating as alleged by plaintiff.[215]

        The court agrees that the record demonstrates that the ALJ properly considered

the effects of plaintiffs impairments, separately and in combination, and recommends

granting summary judgment to defendant on this issue.

## VI.     ORDER AND RECOMMENDED DISPOSITION

        For the reasons contained herein, I recommend that:

        (1) Defendant's cross-motion for summary judgement (D.I. 17) be GRANTED

with regard to the ALJ's evaluation of plaintiff's obesity, leg impairment, and

consideration of plaintiff's impairments in combination and be DENIED with regard to

the ALJ's consideration of plaintiff's treating physician and her consideration of plaintiff's

---

        [213] *Id.* (emphasis added); *id* at 18 ("In considering the claimant's *symptoms*, the undersigned must follow a two step process in which it must first be determined whether there is an underlying medically determinable physical or mental *impairment(s)*–i.e., an *impairment(s)* that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce the claimant's pain or other symptoms.  Second, once an underlying physical or mental *impairment(s)* that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's *symptoms* to determine the extent to which they limit the claimant's ability to do basic owrk activities.  (emphasis added)).
        [214] *Id.* at 18.
        [215] *Id.* at 19 (emphasis added).

the ALJ's consideration of plaintiff's treating physician and her consideration of plaintiff's credibility.

(2) Plaintiff's motion for summary judgment (D.I. 16) be GRANTED on the issues of the ALJ's consideration of plaintiff's treating physician and her consideration of plaintiffs credibility and be DENIED as to all other issues. As a result, remand to address the findings herein is recommended.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated November 16, 2006, a copy of which is available on the Court's website, www.ded.uscourts.gov.

April 8, 2010

UNITED STATES MAGISTRATE JUDGE